KEVIN A. DARBY, ESQ. (#7670)
TRICIA M. DARBY, ESQ. (#7956)                    *E-filed 07/05/2010*
DARBY LAW PRACTICE, LTD.
4777 Caughlin Parkway
Reno, Nevada 89519
Telephone: (775) 322-1237
Facsimile: (775) 996-7290
E-mail: kevin@darbylawpractice.com
        tricia@darbylawpractice.com

Attorney for Pacific Pawnbrokers, Inc.

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | CASE NO.    BK-N-09-53610-gwz |
| | Chapter 11 |
| PACIFIC PAWNBROKERS, INC., | |
| | **DISCLOSURE STATEMENT** |
| Debtor. | |
| | Hearing Time: |
| | Hearing Time: |

_____/

### DISCLOSURE STATEMENT FOR
### PACIFIC PAWNBROKERS, INC.'S
### PLAN OF REORGANIZATION

## I.    INTRODUCTION

This is the disclosure statement (the "Disclosure Statement") in the chapter 11 case of PACIFIC PAWNBROKERS, INC. (the "Debtor").    This Disclosure Statement contains information about the Debtor and describes the Debtor's Chapter 11 Plan of Reorganization (the "Plan") filed by Debtor in this case.    A full copy of the Plan accompanies this Disclosure Statement.    *Your rights may be affected.    You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney.    If you do not have an attorney, you may wish to consult one.*

The proposed distributions under the Plan are discussed at pages 7-8 of this Disclosure Statement.    General unsecured creditors are classified in Class 2, and will receive a distribution of 10% of their allowed claims.    It is estimated that if the Debtor were to liquidate under chapter 7 of the Bankruptcy Code, unsecured creditors would receive less than 2% of their allowed claims.

**A.      Purpose of This Document**

This Disclosure Statement describes:

- The Debtor and significant events during the bankruptcy case,
- How the Plan proposes to treat claims or equity interests of the type you hold (i.e., what you will receive on your claim or equity interest if the plan is confirmed),
- Who can vote on or object to the Plan,
- What factors the Bankruptcy Court (the "Court") will consider when deciding whether to confirm the Plan,
- Why Debtor believes the Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation, and
- The effect of confirmation of the Plan.

Be sure to read the Plan as well as the Disclosure Statement. This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.

**B.      Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

The Court has not yet confirmed the Plan described in this Disclosure Statement. This section describes the procedures pursuant to which the Plan will or will not be confirmed.

   1.      *Time and Place of the Hearing to Confirm the Plan*

The hearing at which the Court will determine whether to confirm the Plan will take place on _____, at _____, in Courtroom 3, at C. Clifton Young Federal Building, 300 Booth Street, Reno, Nevada 89509.

   2.      *Deadline For Voting to Accept or Reject the Plan*

If you are entitled to vote to accept or reject the plan, vote on the enclosed ballot and return the ballot in the enclosed envelope to Darby Law Practice, 4777 Caughlin Parkway, Reno, NV 89519, or via facsimile at 775.996.7290. See section IV.A. below for a discussion of voting eligibility requirements.

Your ballot must be received by _____ or it will not be counted.

2

3.      *Deadline For Objecting to the Confirmation of Plan*

Objections to this Disclosure Statement or to the confirmation of the Plan must be filed with the Court and served upon Debtors' Counsel of Record and the Office of the United States Trustee.

4.      *Identity of Person to Contact for More Information*

If you want additional information about the Plan, you should contact Kevin A. Darby, Esq., 4777 Caughlin Parkway, Reno, NV 89519; Telephone: 775.322.1237; Facsimile: 775.996.7290.

**C.      Disclaimer**

***The Court has approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms.  The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court has approved this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted.***

**II.      BACKGROUND**

**A.      Description and History of the Debtor's Business; Descriptions of Events Leading To Filing of this Case.**

The Debtor is a Nevada corporation, which was incorporated on June 1, 1983.  Since then, the Debtor has operated as a pawnshop, check cashing and loan business.  Debtor's initial business location was at 1206 B Street, Sparks, Nevada, which in 1991 relocated to 1246 Victorian Avenue, Sparks, Nevada ("Store 1").  In 1986, the Debtor expanded operations and opened a second location at 916 B Street, Sparks, Nevada, doing business as Money Mart, which also operated as pawnshop and check cashing business ("Store 2").  Also in 1986, Debtor opened a third location at 124 West Second Street, Reno, Nevada, also doing business as Money Mart ("Store 3").  Store 3 relocated to 701 Ryland, Reno, Nevada in 1991 and began doing business as Pacific Pawnbrokers.

In order to fund the expansion and operation of Debtor's business, the Debtor borrowed substantial sums from private parties in the mid-1980's. Those loans constitute the overwhelming majority of the Debtor's unsecured creditors in this case.

3

In 1995, Debtor opened a fourth location in South Lake Tahoe, California ("Store 4"). In 2003, Debtor's lease for Store 4 expired and Debtor closed this location. All assets of Store 4 were moved to Store 3.

Beginning in late 2007, and accelerating in 2008, Debtor experienced a substantial downturn in its business. This downturn coincided with the collapse of the local real estate market, and the beginning of the nationwide recession.

In June 2008, the City of Sparks acquired all the real estate and building where Store 3 operated and Debtor was forced to relocate. At that time, Debtor closed Store 3 and moved all inventory and removable fixtures to Store 3.

In October 2008, Debtor was forced to close Store 2, due to the continued downturn in its business. Debtor moved all inventory from Store 2 to Store 3.

Currently, the Debtor operates only Store 3.

**B.      Management of the Debtor Before and During the Bankruptcy**

During the two years prior to the date on which the bankruptcy petition was filed, the sole officer and director in control of the Debtor (collectively the "Manager") was Ben Derian. .The Manager of the Debtor during the Debtor's chapter 11 case has continued to be Ben Derian.

After the effective date of the order confirming the Plan, the sole director and officer of the Debtor, or successor of the Debtor under the Plan (collectively the "Post Confirmation Managers"), will be Ben Derian.

Mr. Derian is paid a salary of $71,000 per year.

**C.      Significant Events During the Bankruptcy Case**

Since this case was filed, Debtor has continued to operate its pawnshop, check cashing and lending business at 701 Ryland Avenue, Reno, Nevada. At the same time, Debtor was put together a business plan to allow it to become profitable and fund its Plan. Most notably, Debtor intends to expand its services to include a jewelry repair trade shop. Debtor is prepared to hire two additional jewelers and begin soliciting wholesale jewelry repair trade work. Debtor already has all necessary tools and equipment for this work, so no initial cash outlay will be required. Competition for this work in the Reno area is practically non-existent. Ben Derian, Debtor's President, previously engaged in the wholesale jewelry repair business for over ten years. Mr.

Derian has substantial knowledge and experience in this area and believes it can be a profitable aspect of Debtor's business.  Debtor estimates an addition $4,000.00 per month of income from wholesale jewelry repair work.

In addition, Debtor is working to expand its online sales on eBay, by listing additional items in its inventory.

Finally, Debtor believes its most valuable asset moving forward is its collateral loan business.  Nevada law sets a maximum interest rate of 10% for this type of lending. Traditionally, Debtor and its competitors all charge the maximum 10% rate.  Debtor believes by discounting this rate for customers who redeem their pawned items will increase business and in turn cash flow.  Debtor is not aware of any other pawnshop in Northern Nevada that discounts its rates charged for collateral loans.  Debtor believes it can market this approach for increased market share and customer loyalty.  Collateral loans make up 60% of Debtor's business, so increasing income in this area should have substantial tangible benefits.

**D.    Projected Recovery of Avoidable Transfers**

The Debtor does not intend to pursue preference, fraudulent conveyance, or other avoidance actions.

**E.    Claims Objections**

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to claims.  Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld.  The procedures for resolving disputed claims are set forth in Article V of the Plan.

**F.    Current Financial Condition**

The identity and fair market value of the estate's assets are listed in Exhibit A.

The Debtor's most recent monthly operating report filed in this case is attached as Exhibit B.

**III.    SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS**

A.    What is the Purpose of the Plan of Reorganization?

As required by the Code, the Plan places claims and equity interests in various classes and

describes the treatment each class will receive. The Plan also states whether each class of claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

### B.    Unclassified Claims

Certain types of claims are automatically entitled to specific treatment under the Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code. As such, the Plan Proponent has not placed the following claims in any class:

#### 1.    *Administrative Expenses*

Administrative expenses are costs or expenses of administering the Debtor's chapter 11 case which are allowed under § 507(a)(2) of the Code. Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition. The Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment.

The following chart lists the Debtor's estimated administrative expenses, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Professional Fees, as approved by the Court. | **$10,000.00** | Paid in full pursuant to the terms of treatment of Class 1 creditors under the Plan, see Section III(C), below. |
| Office of the U.S. Trustee Fees | **$0.00** | Paid in full on the effective date of the Plan |
| TOTAL | **$10,000.00** | |

#### 2.    *Priority Tax Claims*

Priority tax claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code. Unless the holder of such a § 507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim, in regular installments paid over a

period not exceeding 5 years from the order of relief.  The Debtor does not believe it owes any § 507(a)(8) priority tax claims:

### C.    Classes of Claims and Equity Interests

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

| CLASS | IMPAIRMENT | TREATMENT |
|---|---|---|
| Class 1 – Administrative Priority Claims | Unimpaired | Class 1 is unimpaired by this Plan, and each holder of a Class 1 Priority Claim will be paid in full, in cash,  from the funds paid quarterly by the Debtor to the Plan Fund, as defined and detailed in Section VII, below. Distributions from the Plan Fund shall be first made to allowed Class 1 allowed administrative claims until paid in full, before distributions to any other class on this Plan are made. |
| Class 2  General Unsecured Creditors<br><br>Total Estimated Claims: **$2,955,492.79** | Impaired | Allowed claims of Class 2 creditors shall receive prorated distributions from the Plan Fund, as defined and detailed in Section VII, below, which payments shall total at least ten-percent (10%) of each allowed Class 2 claim.  Payments to the Plan Fund shall first be distributed to pay allowed Class 1 administrative claims. Upon payment in full of all Class 1 claims, payments will be distributed quarterly to the allowed claims of Class 2 unsecured creditors and will continue as detailed in Section VII, below, until all unsecured claims receive at least 10% of their allowed claim.<br><br>All portions of allowed Class 2 claims not paid pursuant to this Plan shall be forever discharged and rendered non-collectable against the Debtor. |

4.    *Class of Equity Interest Holders*

Equity interest holders are parties who hold an ownership interest (i.e., equity interest) in the Debtor.  In a corporation, entities holding preferred or common stock are equity interest holders.  The following chart sets forth the Plan's proposed treatment of the class of equity interest holders:

| CLASS | IMPAIRMENT | TREATMENT |
|---|---|---|

| | n/a | |
|---|---|---|
| <u>Class 3</u> - Equity Security Holders of the Debtor | | All Class 3 claimholders shall retain their interest in the Debtor. |

### D.      Means of Implementing the Plan

#### 1.      *Source of Payments*

Payments and distributions under the Plan will be funded by the ongoing operations of Debtor's business.  As detailed in section II(C), above, Debtor is prepared to make three changes to its business operations to increase profitability and fund its Plan: (1) the addition of a wholesale jewelry repair shop; (2) increased internet sales; and (3) discounting its interest rate on collateral loans.

#### 2.      *Post-confirmation Management*

The Post-Confirmation Managers of the Debtor, and their compensation, shall be as follows:

| Name | Insider? | Position | Compensation |
|---|---|---|---|
| **Ben Derian** | **Yes** | **President, Director** | **$71,000.00 per year** |

### E.      Risk Factors

The Debtors' ability to fund this Plan is based entirely upon the profitable operation of its business.  Debtor's business has sustained periods in the past where it has not operated profitably. A portion of Debtor's business is retail sales, which are dependent upon the strength of the consumer economy.  Further national and regional economic downturn could compromise the Debtor's ability to fund the Plan.  While Debtor's do not believe it is likely, a failure to fund the Plan would result in a liquidation of the Debtor's business.

### F.      Executory Contracts and Unexpired Leases

The Plan lists all executory contracts and unexpired leases that the Debtor will assume under the Plan.  Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any.  The Plan also lists how the Debtor will cure and compensate the

other party to such contract or lease for any such defaults.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.

All executory contracts and unexpired leases that are not listed in the Plan will be rejected under the Plan.  Consult your adviser or attorney for more specific information about particular contracts or leases.

If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

### G.    Tax Consequences of Plan

***Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, And/Or Advisors.***

## IV.    CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Code.  These include the requirements that:  the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible.  These requirements are <u>not</u> the only requirements listed in § 1129, and they are not the only requirements for confirmation.

### A.    Who May Vote or Object

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan.  A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Plan Proponent believes that class 2 is impaired and that holders of claims

in each of these classes are therefore entitled to vote to accept or reject the Plan.  The Plan Proponent believes that classes 1 and 3 are unimpaired and that holders of claims in each of these classes, therefore, do not have the right to vote to accept or reject the Plan.

1.    *What Is an Allowed Claim or an Allowed Equity Interest?*

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan.  Generally, a claim or equity interest is allowed if either (1) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest.  When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

**The deadline for filing a proof of claim in this case was __.**

2.    *What Is an Impaired Claim or Impaired Equity Interest?*

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is *impaired* under the Plan.  As provided in § 1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

3.    *Who is **Not** Entitled to Vote*

The holders of the following five types of claims and equity interests are *not* entitled to vote:

holders of claims and equity interests that have been disallowed by an order of the Court;

holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes.

holders of claims or equity interests in unimpaired classes;

holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of

the Code; and

holders of claims or equity interests in classes that do not receive or retain any value under the Plan;

administrative expenses.

***Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan.***

4.    *Who Can Vote in More Than One Class*

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

**B.    Votes Necessary to Confirm the Plan**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes.

1.    *Votes Necessary for a Class to Accept the Plan*

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

2.    *Treatment of Nonaccepting Classes*

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner prescribed by § 1129(b) of the Code.  A plan that binds nonaccepting classes is commonly referred to as a "cram down" plan. The Code allows the Plan to bind nonaccepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired class

that has not voted to accept the Plan.

*You should consult your own attorney if a "cramdown" confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.*

C.      **Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation.  A liquidation analysis is attached to this Disclosure Statement as Exhibit C.  Debtor projects creditors will receive approximately 10% on their claim under this Plan, but would receive only 2% of their claims if the Debtor were liquidated.

D.      **Feasibility**

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

1.      *Ability to Initially Fund Plan*

The Plan Proponent believes that the Debtor will have enough cash on hand on the effective date of the Plan to pay all the claims and expenses that are entitled to be paid on that date.

2.      *Ability to Make Future Plan Payments And Operate Without Further Reorganization*

The Plan Proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments.  The Plan Proponent has provided projected financial information.  Those projections are listed in Exhibit D.

*You Should Consult with Your Accountant or other Financial Advisor If You Have Any Questions Pertaining to These Projections.*

V.      **EFFECT OF CONFIRMATION OF PLAN**

A.      **Discharge of Debtor**

On the effective date of the Plan, the Debtor shall be discharged from any debt that arose before confirmation of the Plan, subject to the occurrence of the effective date, to the extent

specified in § 1141(d)(1)(A) of the Code, except that the Debtor shall not be discharged of any debt (i) imposed by the Plan, (ii) of a kind specified in § 1141(d)(6)(A) if a timely complaint was filed in accordance with Rule 4007(c) of the Federal Rules of Bankruptcy Procedure, or (iii) of a kind specified in § 1141(d)(6)(B).  After the effective date of the Plan your claims against the Debtor will be limited to the debts described in clauses (i) through (iii) of the preceding sentence.

### B.    Modification of Plan

The Plan Proponent may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new disclosure statement and/or revoting on the Plan.

Upon request of the Debtor, the United States trustee, or the holder of an allowed unsecured claim, the Plan may be modified at any time after confirmation of the Plan but before the completion of payments under the Plan, to (1) increase or reduce the amount of payments under the Plan on claims of a particular class, (2) extend or reduce the time period for such payments, or (3) alter the amount of distribution to a creditor whose claim is provided for by the Plan to the extent necessary to take account of any payment of the claim made other than under the Plan.

### C.    Final Decree

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Plan Proponent, or such other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case.  Alternatively, the Court may enter such a final decree on its own motion.

DATED this 5th day of July, 2010.

Respectfully submitted,

PACIFIC PAWN BROKERS, LLC                    DARBY LAW PRACTICE, LTD

　　/s/ BEN DERIAN                                    /s/ KEVIN A. DARBY
By:_____            By:_____
　　Ben Derian, President                         Kevin A. Darby, Esq.,
　　Debtor                                        Attorney for Debtor

13